[Civ. No. 20659. Second Dist., Div. One. Apr. 18, 1955.]

THE PEOPLE ex rel. ARDY V. BARTON, Appellant, v. AMERICAN AUTOMOBILE INSURANCE COMPANY (a Corporation) et al., Respondents.

Edmund G. Brown, Attorney General, and Charles A. Barrett, Deputy Attorney General, for Appellant.

Ardy V. Barton, in pro. per., Henry G. Bodkin and Jerry Giesler for Relator.

Parker, Stanbury, Reese & McGee, Raymond G. Stanbury, Pillsbury, Madison & Sutro, A. B. Tanner and Charles F. Prael for Respondents.

WHITE, P. J.—This is an appeal by plaintiff from a judgment for defendants, entered upon plaintiff's failure to amend after a general demurrer was sustained to plaintiff's first amended petition in quo warranto.

Defendants were insurance companies authorized to do and doing business in the State of California. Included in the business of defendants was the writing of policies of insurance covering negligence of automobile drivers.

In the first amended petition in quo warranto, plaintiff alleged that defendants did cause to be published in various nationally distributed magazines, including "Life" and "The Saturday Evening Post," advertisements relating to the subject of excessive jury verdicts.

Attached to the amended petition were photostatic copies of the advertisements upon which plaintiff's petition was based.

On the first advertisement so set forth (marked Exhibit "A"), appears the picture of a woman holding a letter in her hand and beneath the picture appears the following:

"Me? *I'm* Paying for Excessive Jury Awards?

"Yes, Mrs. Jones, you pay for liability and damage suit verdicts whether you are insured or not.

"For example, higher insurance rates paid by the folks who helped fill your market basket—farmer, processors, truckers, wholesalers and retailers—are reflected in your grocery bill.

"You see, claims against insurance companies are paid out of policyholders' premiums. When jury awards are excessive, all business firms' premiums must be increased.

"And since insurance premiums are part of the overall cost of doing business, higher premiums must be passed on to you and every other member of the buying public through higher prices.

"Next time you serve on a jury, remember this: When you are overly generous with an insurance company's money, you help increase not only your own premiums, but also the cost of every article and service you buy.

"Most claims for damages are legitimate and reasonable, and are amicably settled out of court. However, as jurors tend more and more to give excessive awards in cases that do go to court, such valuations are regarded as establishing the 'going' rate for the day-to-day out-of-court claims all of which means increased insurance premium cost to the public.

"AMERICAN-ASSOCIATED INSURANCE COMPANIES.

"American Automobile Insurance Company — Associated Indemnity Corporation—St. Louis 2, Missouri".

On the next advertisement (marked Exhibit "B") appears the picture of a jury being sworn to try a case, below which appears the following:

". . . A True Verdict Render According To The Law and the Evidence.

"Jury service is often a difficult responsibility because, when making decisions, we always are tempted to listen to our hearts as well as our heads.

"But the Juror's Oath demands that jurors decide 'according to . . . the evidence.' Jurors sometimes forget this. Ruled by emotion rather than facts, they arrive at unfounded or excessive awards . . . verdicts occasionally even higher than requested!

"These men and women may be scrupulously honest. But as jurors, they feel in their hearts that the injured person—although he may have caused the accident—is entitled to an award.

"Because insurance rates depend on claim costs, these honest jurors cost millions of policyholders, including themselves, countless extra dollars in premiums every year.

"When you, as a juror, sit in judgment on a suit involving personal injuries, be fair with the public's—and your—money. Reach a decision according to the evidence." Then follows the same language as appears in the last two paragraphs of Exhibit "A".

The third advertisement (marked Exhibit "C") presents the picture of an officer sitting outside a closed jury room, and below which appears the following:

"Your Insurance Premium is Being Determined Now.

"This could be any courtroom in the country— Behind the locked door, twelve men and women are reaching a verdict involving a defendant protected by a casualty insurance company. What they decide affects your pocketbook.

"All claims against insurance companies have to be paid out of funds created by premiums from policyholders. When these funds are insufficient, insurance rates must be increased.

"Casualty insurance companies have been losing an average of $11 on every $100 of earned automobile liability premiums. More accidents are partly responsible. So are excessive jury awards, rendered by jurors who feel they can afford to be generous with the 'rich' insurance company's money. Actually, jurors who are responsible for awards in excess of what is just and reasonable are soaking *you* by raising insurance rates." This is followed by a repetition of the statements contained in the last two paragraphs of the above Exhibit "A".

In the fourth advertisement (marked Exhibit "D") is found a photograph of a father and son engaged in conversation, and below which appears the following:

"Bill Set Me Straight on Jury Awards.

"Bill's my son—a senior in law school. Last night I told him about my recent experience as a juror.

"As a businessman, I knew the woman involved in the trial was legally at fault. She walked into a moving car. But she was a widow with a child to support. And I felt certain that the driver of the car was insured.

"The doctor said that the widow wouldn't be able to hold down a steady job for at least a year, so we awarded her a healthy sum. After all, her child must eat.

" 'But the law,' said Bill, 'clearly states that the verdict must be based on legal liability, fault for the accident, as determined by the evidence.'

" 'The insurance company can afford to pay,' I protested.

" 'But claims,' argued Bill, 'must be paid out of premiums belonging to thousands of policyholders—including widows, too. And don't forget, when premium collections do not cover claims, everybody's insurance rates—including yours—have to go up.'

"You know, sometimes it pays to listen . . . even to your son." Following this is the same wording as contained in the last two paragraphs of the aforesaid Exhibit "A."

Exhibit "E," also attached to plaintiff's petition, is a page taken from "Shop Talk," a publication apparently sponsored by "American-Associated Insurance Companies," of St. Louis, Missouri. The page contains an article upon the campaign being conducted "To combat the important problem of unjust jury awards," and in the lower left-hand corner reference is made to the above-mentioned advertisements in "Life" and "Saturday Evening Post," with the comment:

"More Than One Out of Every Three potential jurors will see at least one of these advertisements appearing in Life and The Saturday Evening Post. Based on total readership-per-issue figures for each magazine more than 70,000,000 persons will see these messages."

It was further charged in the petition that the foregoing publications amounted to a contempt of the judicial process and a conspiracy formed with the intent to corrupt jurors.

The petition prayed for a restraint against further publication of said or similar matter or forfeiture of defendants' corporate rights in the State of California, or that defendants be required to pay a suitable fine as punishment.

Defendants filed a general demurrer on the grounds that the petition sought to violate and suppress respondents' right of freedom of speech and of the press guaranteed by the Constitution of the United States and by the Constitution of the State of California, and that the facts alleged were insufficient

to show a violation of Penal Code, section 95, a contempt of the judicial process or a conspiracy or intent to corrupt jurors, or grounds for a proceeding in quo warranto. The demurrer was sustained with leave to amend. Plaintiff declined to amend and a judgment of dismissal was entered.

The theory of appellant in this proceeding is thus stated in its brief: ''This appellant is the State of California, and if the conduct of a corporation, the creature of this State, is in violation of its penal statutes, this appellant, the State of California, may bring an action against the offending corporation for dissolution, fine, restraining order, etc., or any combination of these remedies.'' (Corp. Code, § 4690; Code Civ. Proc., § 803.)

Because we regard it as the main if not determinative issue presented by this controversy, we shall first give consideration to respondents' claim that their demurrer was properly sustained because this proceeding constitutes a form of prior restraint upon publication barred by the free speech and free press provisions of the federal and state Constitutions (U.S. Const., Amend. I and XIV, § 1; Cal. Const., art. I, § 9).

From time immemorial the most conspicuous feature of history has been the struggle between liberty and authority. Undoubtedly, the framers of our Constitution and Bill of Rights, as well as those who brought into being our own California Constitution, recognized that at the time of the adoption of these immortal documents, as in ages past, we are not without tragic proof that the exacted power of some governments to ignore the inalienable right of the individual to liberty of conscience and freedom of expression is the handmaiden of tyranny. In America, we have always felt and vigorously asserted that free speech is a natural and inherent right, and that it, and freedom of the press, are among the most sacred and vital rights of mankind. While the constitutional guarantee above referred to is a fundamental one and is couched in the broadest language, the right thus guaranteed is, of course, not without limit. ■ One such limitation is that no person is permitted to impede or interfere with the orderly administration of justice. But, however intemperate the language, false the charges, or unfair the criticism, they do not admit of judicial restraint or punishment unless there is an immediate, clear and present danger imperiling the administration of justice. The foregoing principles have been firmly established in the recent decisions of the Supreme Court of the

United States, and, interpreting as they do, a provision of the federal Constitution, are binding upon us.

In *Bridges* v. *California,* consolidated with *Times-Mirror Co.* v. *Superior Court,* 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346], both petitioners had been found guilty of contempt and the Supreme Court of California had affirmed (*Bridges* v. *Superior Court,* 14 Cal.2d 464 [94 P.2d 983]; *Times-Mirror Co.* v. *Superior Court,* 15 Cal.2d 99 [98 P.2d 1029].)

In the case of the newspaper, the facts were that two labor union members had been convicted of assault and the trial judge had pending before him applications for probation. Under these circumstances the newspaper discussed the merits of the case at length in its editorial columns, denounced practices relating to the behavior of the accused, and closed with the observation (314 U.S. 252, 272), "Judge A. A. Scott will make a serious mistake if he grants probation to Matthew Shannon and Kennan Holmes. This community needs the example of their assignment to the jute mill."

In the Bridges case, a motion for a new trial was pending in a labor dispute case. During the pendency of that motion Bridges telegraphed to the Secretary of Labor condemning the decision as "outrageous," and threatened he would call a Pacific Coast strike unless a new trial were granted.

In commenting upon the aforesaid cases, Mr. Presiding Justice Peters, speaking for the court in *Turkington* v. *Municipal Court,* 85 Cal.App.2d 631, 642, 643, 644 [193 P.2d 795], said: "In both cases the comment was about a pending case, and in both cases strong, intemperate and untrue remarks were made. The Supreme Court of the United States assumed that in both cases the accused were attempting to influence the course of pending litigation in the trial court. In both cases the trial court found, and the Supreme Court of California affirmed the finding, that the acts had a reasonable tendency to interfere with the orderly administration of justice. Nevertheless, the judgment was reversed, the Supreme Court holding that, as a matter of law, the comments did not present a clear and present danger to the orderly administration of justice. The majority of the court (the decision was 5 to 4) pointed out that prior decisions had established the rule that the constitutional right to free speech must be protected unless the comments about a court or judge are of such a nature 'as to create a clear and present

danger that they will bring about the substantive evils.' (P. 261 [314 U. S.].)  At page 262 [314 U.S.] it is stated:

" 'Moreover, the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be "substantial," . . . it must be "serious," . . .

" 'What finally emerges from the "clear and present danger" cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished . . . For the First Amendment does not speak equivocally. It prohibits any law "abridging the freedom of speech, or of the press." It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow.'

"The court then refutes the argument that, regardless of the free speech provision, this country adopted the English common law on the subject of contempts where a 'mere tendency to obstruct justice' is all that is required, and then stated (p. 270 [314 U.S.]):

" '. . . The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

" 'The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. The very word "trial" connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. But we cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all

channels of public expression to all matters which touch upon pending cases.'

"At page 273 [314 U.S.] appears the following comment: 'In accordance with what we have said on the "clear and present danger" cases, neither "inherent tendency" nor "reasonable tendency" is enough to justify a restriction of free expression.' The court then held that the editorials and telegram did not create, as a matter of law, a clear and present danger.

"*There thus emerges fqrom the Bridges' case a rule that had been strongly hinted at in earlier cases, but now couched in the strongest and most positive language, to the effect that a false publication that merely tends to obstruct justice is not sufficient to justify the interference with the constitutional right to free speech by punishment for contempt, and that there must accompany such tendency a clear and present danger of such obstruction. Such danger must be both 'imminent' and 'serious.' "* (Emphasis added.)

Six years after rendition of the Bridges decision the Supreme Court reaffirmed the reasoning and conclusion therein contained in the case of *Pennekamp* v. *Florida,* 328 U.S. 331 [66 S.Ct. 1029, 90 L.Ed. 1295].

In the case just cited, Mr. Justice Frankfurter, discussing the responsibility of the press at pages 365, 366, had this to say:

"It should not and may not attempt to influence judges or juries before they have made up their minds on pending controversies. *Such a restriction, which merely bars the operation of extraneous influence specifically directed to a concrete case, in no wise curtails the fullest discussion of public issues generally. It is not suggested that generalized discussion of a particular topic should be forbidden, or run the hazard of contempt proceedings, merely because some phases of such a general topic may be involved in a pending litigation. It is the focused attempt to influence a particular decision that may have a corroding effect on the process of justice, and it is such comment that justifies the corrective process.*" (Emphasis added.)

It would serve no useful purpose to here present a detailed analysis of other cases supporting the foregoing doctrine. Suffice it to say that the above principles are enunciated and approved in the cases of *Craig* v. *Harney,* 331 U.S. 367, 376 [67 S.Ct. 1249, 91 L.Ed 1546] ; *Baltimore Radio Show* v. *State,* 193 Md. 300 [67 A.2d 497], certiorari denied, 338 U.S. 912

[70 S.Ct. 252, 94 L.Ed. 562]; *Near* v. *Minnesota ex rel. Olson,* 283 U.S. 697 [51 S.Ct. 625, 75 L.Ed 1357].

It must also be remembered that appellant in this proceeding seeks to restrain respondents from further utterance of their sentiments on claimed excessive jury verdicts or to oust them from carrying on their corporate business in the State of California. Manifestly, this is an attempt at prior restraint upon publication and in essence amounts to censorship, denounced by the state and federal Constitutions in their protection of freedom of speech and press. The courts have held that a statute authorizing such proceedings in restraint on publication is not consistent with the conception of the liberty of the press as historically conceived and guaranteed. ▆ While, as heretofore pointed out, the right of free speech is not unlimited, no one's mouth may be closed in advance, as sought herein, for the purpose of preventing an utterance of his sentiments, however mischievous the prospective results of such utterance. The right of free speech was his, but at all times he was responsible to the law for an abuse of that right *(Near* v. *Minnesota ex rel. Olson, supra; Dailey* v. *Superior Court,* 112 Cal. 94, 97, 99 [44 P. 458, 53 Am.St.Rep. 160, 32 L.R.A. 273]; *Empire Theatre Co.* v. *Cloke,* 53 Mont. 183 [163 P. 107, L.R.A. 1917E 383]; *Northwestern Pac. R. Co.* v. *Lumber & Sawmill Workers' Union,* 31 Cal.2d 441, 448, 449, 450 [189 P.2d 277].) The principle underlying the rules enunciated in the cited cases is the inability to conceive how anyone can possess the right to publish what he pleases, subject only to penalty for abuse, and at the same time be prevented by any court from doing so. ▆ We are persuaded that the quo warranto statutes in this state deal with forfeiture and suppression of corporate rights, and not with publications *per se,* and their use is not permitted to effect restraint upon publication—which is the essence of censorship.

▆ The advertisements here in question amount to a generalized discussion of a particular topic—the claimed excessive awards in negligence cases. There is no effort made to influence a particular decision. As pointed out by respondents, "The gist of the four advertisements attached to the amended petition is that verdicts should be rendered ' "according to the LAW and the EVIDENCE." ' " They protest excessive verdicts rendered on the assumption that ' "The insurance company can afford to pay." ' " They point out that when jurors do not base their verdicts on the law and the evidence, but, in violation of their oath, upon an impulse

to be 'overly generous with an insurance company's money'— the jurors, in violating their oath, hurt not just the insurance company but themselves and the public generally. To allege by way of a conclusion that a protest on behalf of the whole insurance industry and, according to the beliefs of many, on behalf of the public at large, is 'presently dangerous of prejudicing and corrupting' jurors, is to reject every reasonable hypothesis from the facts pleaded.''

Appellant relies heavily upon the case of *People* v. *Connors,* 70 Cal.App. 315 [233 P. 362], in which a conviction under Penal Code, section 95, was reversed because of an erroneous instruction. Upon a retrial defendant was again convicted resulting in an affirmance of the judgment (77 Cal.App. 438 [246 P. 1072]). In the cited case, Connors caused copies of a multigraphed letter to be circulated promiscuously in Sacramento County during the pendency of a series of criminal syndicalism cases and during the actual trial of one. The letter strongly criticized the law under which the cases were prosecuted, attacked the prosecution witnesses as ''a trio of degenerates'' and defended the accused. The court said that the defendant would be subject to punishment if the letters were sent in the hope and expectation of thereby reaching many jurors and with the intent of corruptly influencing them. However, the Connors case is unlike the one now engaging our attention in that it did not involve the form of prior restraint sought here. There was no attempt to restrain future utterances. The publication in the Connors case related to particular and specific pending cases. And in neither appeal was the constitutional question presented. However, in the Connors case the court carefully distinguishes publications ''for the sole purpose of creating public opinion'' from publications corruptly attempting to influence jurors in specific pending cases, thereby anticipating the holding in *Pennekamp* v. *Florida, supra,* that only the extraneous influence ''specifically directed to a concrete case'' can be barred.

The reasoning in the cases cited by us is conclusive in the case at bar. The language used in the questioned advertisements herein was not nearly so intemperate or unfair as that charged in the Pennekamp and Craig cases, *supra.* When appellant's petition is read in the light of the cases cited, it seems to us the conclusion is inescapable that there is no sufficient showing therein of a ''clear and present danger'' to the orderly administration of justice, nor that any

such danger was "serious" and "imminent." On the basis of the facts alleged in the amended petition, the maintenance of quo warranto proceedings against respondent must be held, under the authorities herein cited, to amount to an infringement upon rights guaranteed respondents by the federal and state Constitutions. Respondents' demurrer was therefore properly sustained.

The foregoing conclusion at which we have arrived renders it unnecessary to discuss or decide other points raised on this appeal.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied May 9, 1955, and appellant's petition for a hearing by the Supreme Court was denied June 16, 1955. Carter, J., was of the opinion that the petition should be granted.