[Civ. No. 56355. Second Dist., Div. Two. Feb. 27, 1980.]

STEPHANIE LOZA, Plaintiff and Appellant, v.
LEONARD PANISH, as Registrar-Recorder, etc., Defendant
and Respondent.

**COUNSEL**

Gilmartin & Most and Robert A. Most for Plaintiff and Appellant.

John H. Larson, County Counsel, and Edward G. Pozorski, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**ROTH, P. J.**—Appellant sought a writ of mandate pursuant to Elections Code section 10015[1] to compel respondent to reject any candidate's statement submitted under Elections Code section 10012 that contains any reference to anything other than the candidate's own

---

[1]The section provides: "Any voter may seek a writ of mandate alleging that an error or omission has occurred or is about to occur in the placing of any name on, or in the printing of, a ballot, sample ballot, voter pamphlet or other official matter, or that any neglect of duty has occurred or is about to occur.

"A peremptory writ of mandate shall issue only upon proof that the error, omission or neglect is in violation of this code or the Constitution and that issuance of the writ

"education and qualifications" and particularly any candidate's statement that contains any reference to any opposing candidate. The petition was denied and this appeal ensued. We affirm the trial court's judgment.

Elections Code section 10012 provides in pertinent part that: "Each candidate for nonpartisan elective office in any local agency, including any city, county, city and county or district, may prepare a candidate's statement on an appropriate form provided by the clerk. Such statement may include the name, age and occupation of the candidate and a brief description of no more than 200 words, of the candidate's education and qualifications expressed by the candidate himself; . . . .

"The clerk shall send to each voter together with the sample ballot, a voter's pamphlet which contains the written statements of each candidate that is prepared pursuant to this section . . . .

"The local agency may estimate the total cost of printing, handling, translating, and mailing the candidate's statements filed pursuant to this section, and may require each candidate filing a statement to pay in advance to the local agency his or her pro rata share as a condition of having his or her statement included in the voter's pamphlet.

"The clerk shall reject any statement, which contains any obscene, vulgar, profane, scandalous, libelous or defamatory matter, or any language which in any way incites, counsels, promotes or advocates hatred, abuse, violence or hostility toward, or which tends to cast ridicule or shame upon any person or group of persons by reason of sex, race, color, religion or manner of worship, or any language or matter the circulation of which through the mails is prohibited by Congress.

"Nothing in this section shall be deemed to make any such statement or the authors thereof free or exempt from any civil or criminal action or penalty because of any false, slanderous or libelous statements offered for printing or contained in the voter's pamphlet.

". . . . . . . . . . . . . . . . . . ."

■ The first of appellant's contentions, simply stated, is that the

---

will not substantially interfere with the conduct of the election.
"Such action or appeal shall have priority over all other civil matters."

language "Such statement *may* include the name, age and occupation of the candidate and a brief description...of [his] education and qualifications...." (italics added) is such as to *confine* the candidate's statement to such information, and is cast in the permissive rather than mandatory form only to allow one seeking nonpartisan elective office to *omit* so much of the enumerated material as is wished not to be disclosed. Respondent, on the other hand, maintains not only that the permissive form is ordinarily and most reasonably understood as being nonrestrictive, but that the admonition found in the section respecting the lack of exemption for civil or criminal actions or penalties arising out of false, slanderous or libelous statements offered in the statement necessarily presupposes the possible inclusion of data not having solely to do with the candidate and that that language would be superfluous otherwise.

We accept appellant's assertion there is no adequate legislative history associated with the statute in question which would itself provide the means for resolution of the parties' respective arguments on this point. That being the case, however, and on the basis of principles of statutory construction sufficiently familiar as to make citation of authority unnecessary, we are disposed to find respondent's position more persuasive and hold accordingly a candidate's statement may include information regarding his qualifications which goes beyond mere personal data respecting his name, age, occupation and education.

■ In addition to the foregoing, appellant contends respondent must exercise such discretion as is necessary to reject any candidate's statement which contains material prohibited by the terms of the statute as obscene, defamatory or inciting in its character. In testing this suggestion we look no further than the pronouncements of our supreme court found in *Wilson v. Superior Court* (1975) 13 Cal.3d 652 [119 Cal.Rptr. 468, 532 P.2d 116], that: "A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press. Section 2 of article I of the California Constitution provides, 'Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.' This court's interpretation of the provision is exemplified by the early case of *Dailey v. Superior Court* (1896) 112 Cal. 94 [44 P. 458], in which we annulled an order restraining the performance of a play relating to a pending trial. In this state we have consistently viewed with great solicitude the right to uninhib-

ited comment on public issues. (See, e.g., *Sun Co. of San Bernardino* v. *Superior Court* (1973) 29 Cal.App.3d 815 [105 Cal.Rptr. 873]; *People* v. *American Automobile Ins. Co.* (1955) 132 Cal.App.2d 317 [282 P.2d 559].)

"...........

"...The concept that a statement on a public issue may be suppressed because it is believed by a court to be untrue is entirely inconsistent with constitutional guarantees and raises the spectre of censorship in a most pernicious form.

"Chief Judge Lumbard made this abundantly clear in *Cosby* v. *Bradstreet Company* (2d Cir. 1963) 312 F.2d 483, 485, cert. den., 373 U.S. 911 [10 L.Ed.2d 412, 83 S.Ct. 1300], when he held that publication of information about a person, 'without regard to truth, falsity or defamatory character of that information,' was not subject to prior restraint. Chief Justice Burger in *Miami Herald Publishing Co.* v. *Tornillo, supra*, refused to permit governmental interference with a publication's 'content...and treatment of public issues and public officials—whether fair or unfair....' (418 U.S. at p. 258 [41 L.Ed.2d at p. 741].)

"Watson relies upon cases which state that libelous pronouncements are not protected by the United States Constitution (*Beauharnais* v. *Illinois* (1952) 343 U.S. 250, 266 [96 L.Ed. 919, 932, 72 S.Ct. 725]; *Smoot* v. *Fox* 6th Cir. 1965) 353 F.2d 830, 833) and are subject to prior restraint (*Anderson* v. *Dean* (N.D.Ga. 1973 (354 F.Supp. 639, 642). Whether or not these cases, particularly the latter district court decision, are viable, the rule they purport to invoke is inapplicable here. In *New York Times Co.* v. *Sullivan, supra*, 376 U.S. 254, 268 [11 L.Ed.2d 686, 699], the United States Supreme Court distinguished such cases on the ground that they did not involve criticism of the official conduct of public officials. The court held that 'libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment.' (376 U.S. at p. 269 [11 L.Ed.2d at p. 700].)

"Watson next asserts that the *Near* rationale is inapplicable because the reprinting of newspaper articles does not constitute political discussion. But the mere fact that petitioner chose this type of format, rather than the typical narrative method, to bring his concept of Watson's

background to the attention of the voters can have no significant effect upon the status of the articles as a form of political presentation. Indeed as Chief Justice Hughes wrote in *Lovell* v. *Griffin* (1938) 303 U.S. 444, 452 [82 L.Ed. 949, 954, 58 S.Ct. 666]. 'The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" (*Id.*, at pp. 658-660.)

Measured against these standards, we are of the view that portion of Elections Code section 10012 found in its fourth paragraph and which begins "The clerk shall reject" and ends "is prohibited by Congress." is as written violative of constitutional rights of freedom of expression, both federal and state, and that being thus offensive to such safeguards, the portion cannot stand. And this is true in spite of the fact the Legislature's action in providing by statute a means whereby political candidates may make themselves known to the voting public may be deemed gratuitous. Having elected to make the candidate's statement available, it must do so subject to constitutional requirements.

The judgment is affirmed.

**COMPTON, J.**—I concur.

I wish, however, to emphasize that the result is compelled, as Presiding Justice Roth indicates, by the language used in the statute *and the lack of any persuasive evidence of the Legislature's actual intent.*

Once we have determined, as on this record we must, that the "candidate's statement" is not limited to a recitation of his own qualifications and may contain reference to other matters, it necessarily follows that the registrar of voters cannot be constitutionally empowered to determine for himself which matters should or should not be included in the statement.

I suspect that the Legislature, with noble intentions, desired to afford citizens aspiring to nonpartisan elective office, an inexpensive method of partially escaping from complete anonymity. Regretfully they have achieved their purpose only at the expense of creating an instrumentality which is susceptible of flagrant abuse. That evil could have been constitutionally avoided by specifically limiting the statement to a recitation of personal background and qualifications. That, however, is not what the Legislature did.

**BEACH, J.**—I concur in the affirmance of the judgment of the trial court. However, I do not concur in that part of the majority opinion which declares part of the statute unconstitutional.

On the record before us, the judgment of the trial court well may be sustained on the basis that plaintiff failed to produce sufficient proof to establish the need for issuance of a writ of mandate. The relevant evidence presented was that in a past election the defendant as registrar-recorder accepted two candidate's statements that included matters other than a statement limited to the candidate's own personal qualifications. One candidate's statement declared that an incumbent judge used a county car one weekend to attend to allegedly unofficial business, and that the incumbent was fined for violation of dove hunting laws. Another candidate's statement declared that the candidate would be a full-time judge unlike the incumbent. The insufficiency of this evidence to warrant issuance of a writ of mandate is apparent. The code section as written is permissive and does not say that a candidate's statement shall be only of his qualifications. Thus the candidate's statement in evidence disclosed no reason for rejection on this basis. Neither were the remarks defamatory or libelous per se. On their face they do not appear libelous or defamatory. No evidence was shown to the registrar which proved the remarks untrue or defamatory. More importantly, irrespective of their nature, their acceptance by the defendant registrar-recorder does not mean that the defendant registrar-recorder would fail to exercise the discretion and duty vested in him to examine future statements and to reject any statement which contains any "obscene, vulgar, profane, scandalous, libelous, or defamatory matter." In short the record fully supports the decision of the trial court. The writ of mandate is an extraordinary remedy and may be used to compel the performance of official duty. But a strong case should be made by the party seeking it before a court of law directs an administrative officer how to do his work.

The trial court's judgment simply denied plaintiff the application for the writ. The judgment did not declare any part of the statute unconstitutional. It was unnecessary for the trial court and it is unnecessary for this reviewing court to determine any constitutional question in order to affirm the trial court's decision. Nonetheless, the majority having done so causes the majority opinion to appear to rest equally on a decision of a constitutional issue. The conclusion seems to be that one reason petitioner cannot prevail is because that part of the statute conferring upon

a public officer the need to reject certain statements based on content is a violation of both federal and state constitutional rights of free speech. This indictment of the statute is too broad.

The majority rely on *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652 [119 Cal.Rptr. 468, 532 P.2d 116]. I respectfully suggest that *Wilson* does not support the broad assertion the majority makes. As I understand it, the majority argument is that according to *Wilson* all writing concerning candidates to public office and public issues are protected to the same degree, i.e., they cannot be limited or censored in any way because of the constitutional protection of free speech; such expressions cannot be subject to prior restraint. Although *Wilson* deals with the issue of the invalidity of attempted restraint of a political writing, the holding of *Wilson* is not that merely because of its nature such speech or writing is protected at all times against any restriction.

In *Wilson* an incumbent officeholder attempted to prevent the distribution by his opponent of literature which the incumbent claimed was untrue and defamatory. The attempt was properly denied. There the defendant was at his own expense publishing and distributing his own literature. The fact that he, the candidate, was taking possibly wild shots at the incumbent, whether true or false, could not deprive the defendant of the right to speak and write on political matters free of prior restraint. (*Lovell* v. *Griffin* (1938) 303 U.S. 444 [82 L.Ed. 949, 58 S.Ct. 666]; *Near* v. *Minnesota* (1931) 283 U.S. 697 [75 L.Ed. 1357, 51 S.Ct. 625]; *Hague* v. *C. I. O.* (1939) 307 U.S. 496 [83 L.Ed. 1423, 59 S.Ct. 954].)

The matter at bench is not one of speaking or distributing literature in streets and parks or other public places immemorially held in trust for the use of the public for such purposes. (*Hague* v. *C. I. O., supra*, 307 U.S. 496, 515 [83 L.Ed. 1423, 1436].) The issue here is whether a local government may grant a new privilege to use a particular means of communication and at the same time condition that privileged use. To pose the question is almost to answer it. There are cases too numerous to list where the United States Supreme Court has upheld restrictions not only upon time, place and manner of speech and writing, but upon content as well. Limitations and restriction have been upheld even though the effect thereof is to impose prior restraint. Merely because the case may involve expression through speech or literature does not mean that it is "hands off" if there appears any

restriction thereon. The reports abound in cases where other public interests justify limitations on the place, manner, time and content of speech.

Justice Rehnquist's remarks in *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97, at page 106 [61 L.Ed.2d 399 at page 407, 99 S.Ct. 2667, at page 2673], are appropriate here. "So valued is the liberty of speech and of the press that there is a tendency in cases such as this to accept virtually any contention supported by a claim of interference with speech or the press. [Citation.] I would resist that temptation." He explains the better approach.

"While we have shown a special solicitude for freedom of speech and of the press, we have eschewed absolutes in favor of a more delicate calculus that carefully weighs the conflicting interests to determine which demands the greater protection under the particular circumstances presented." (*Id.*, at p. 106 [61 L.Ed.2d at p. 407, 99 S.Ct. at p. 2672].)

I recognize that nearly all cases upholding speech restriction can be factually distinguished as involving other counterbalancing and extremely important public interest, for example, state and national emergencies, wartime and defense needs. But other less dramatic interests have also served such purpose. Examples are the rights of privacy, reasonable access to and use of radio and postal service, public health and safety in the purchase of drugs and services, consumer protection against fraud, and so on ad infinitum. A complete listing and cataloging of such cases is impossible. New conditions call for new examinations and may provide new tests. It would unduly prolong this discussion to list all past cases. A few illustrations will suffice:

Military commanders may preview, censor, reject or totally prohibit the distribution of literature or petitions to be circulated or of speeches to be made, in or upon military bases even in peace time. Political speech or literature may thus be rejected. (*Secretary of the Navy* v. *Huff* (1980) 444 U.S. 453 [62 L.Ed.2d 607, 100 S.Ct. 606]; *Brown* v. *Glines* (1980) 444 U.S. 348 [62 L.Ed.2d 540, 100 S.Ct. 594] (both petition circulation); *Greer* v. *Spock* (1976) 424 U.S. 828 [47 L.Ed.2d 505, 96 S.Ct. 1211] (speaking).) Political neutrality of the military, high morale and discipline are public interests that the court recognized

as justifying the limitations and restrictions, even though imposed not only upon time, manner and place, but also upon content (in those cases *political* content). It is significant, because applicable here, that others were free to speak on nonrestricted subjects at such bases.

The public's interest in labor peace allows some control on picketing. Because it is a form of free speech and expression, no blanket prohibition against picketing is permissible. (*Thornhill* v. *Alabama* (1940) 310 U.S. 88 [84 L.Ed. 1093, 60 S.Ct. 736].) Nonetheless, several restrictions on certain time, place, and purpose of picketing have been held proper. (*Teamsters Union* v. *Vogt, Inc.* (1957) 354 U.S. 284, 293 [1 L.Ed.2d 1347, 1353, 77 S.Ct. 1166]; *Giboney* v. *Empire Storage Co.* (1949) 336 U.S. 490 [93 L.Ed. 834, 69 S.Ct. 684]; *Teamsters Union* v. *Hanke* (1950) 339 U.S. 470 [94 L.Ed. 995, 70 S.Ct. 773, 13 A.L.R.2d 631]; *Plumbers Union* v. *Graham* (1953) 345 U.S. 192 [97 L.Ed. 946, 73 S.Ct. 585].) Not only actual picketing but pure speech on pending labor problems or cases may be restricted under certain circumstances to avoid "unfair labor practices." (*NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575 [23 L.Ed.2d 547, 89 S.Ct. 1918].)

The public's interest in reasonable access to and the orderly use of radio and television and scarcity of airwaves are unique characteristics which allow restriction by prior licensing. (*Nat. Broadcasting Co.* v. *United States* (1943) 319 U.S. 190 [87 L.Ed. 1344, 63 S.Ct. 997].) But licensing may be withheld or restricted for misuse of the medium. An example is broadcasting obscenity. (*F.C.C.* v. *Pacifica Foundation* (1978) 438 U.S. 726 [57 L.Ed.2d 1073, 98 S.Ct. 3026].)

The right to own, use and to limit others' use of one's private property was sufficient to prohibit distribution of leaflets without permission. (*Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219].)

In *CSC* v. *Letter Carriers* (1973) 413 U.S. 548, 557 [37 L.Ed.2d 796, 804, 93 S.Ct. 2880], the court said: "...it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service and that the political influence of federal employees on others and on the electoral process should be limited." The court thus recognized that interest as important enough to prohibit "political activity" by federal employees under the Hatch Act, even though such prohibition to that extent limited the exercise of free speech.

Admittedly, any system of prior restraint of expression comes to the Supreme Court bearing a heavy presumption against its constitutional validity. (*Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58 [9 L.Ed.2d 584, 83 S.Ct. 631].) However, there is some kind of speech the content of which is not within constitutional protection. Obscenity is one such class of speech. It may be regulated by the states. (*Id.* at p. 65 [9 L.Ed.2d at p. 590]; *Alberts* v. *California* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304].) There are many other examples but the significance of the obscenity cases is that, although difficult to define by statute, a state may prohibit the utterance or dissemination of obscenity. The teaching of the Supreme Court obscenity cases is that such restriction and limitation may take place if the standards are expressly and carefully drawn. The high court has "tolerated such a [system of restraint] only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint." (*Bantam Books* v. *Sullivan, supra*, 372 U.S. 58, 70 [9 L.Ed.2d 584, 593]; see also *Kingsley Books, Inc.* v. *Brown* (1957) 354 U.S. 436 [1 L.Ed.2d 1469, 77 S.Ct. 1325].) Thus in *Freedman v. Maryland* (1965) 380 U.S. 51 [13 L.Ed.2d 649, 85 S.Ct. 734] (invalidating the Maryland film censorship statute), the court noted that in *Times Film Corp.* v. *Chicago* (1961) 365 U.S. 43 [5 L.Ed.2d 403, 81 S.Ct. 391], it upheld a prior submission requirement explaining that each method of expression presents its own peculiar problems. Each case must be dealt with on a case-by-case basis. (*Id.* at p. 49 [5 L.Ed.2d at pp. 407-408].) But, as the court explains, a prior restraint is not necessarily unconstitutional under all circumstances. A censorship-of-content statute is permissible even though it constitutes prior restraint if certain precautionary standards appear, namely: (1) the burden of proving that the content is unprotected is on the censor; (2) the censor's decision is subject to judicial review; and (3) the judicial review is prompt. Thus in *Kingsley Books, Inc.* v. *Brown, supra*, 354 U.S. 436, the court upheld the New York censorship statute. The statute there provided for judicial determination, notice thereof to the offender, an adversary hearing, and decision given within two days of the hearing.

At bench the statute provides for a rejection after examination by the registrar-recorder. As indicated earlier, prior rejection is not per se unconstitutional. (*Secretary of the Navy* v. *Huff, supra*, 444 U.S. 453; *Brown* v. *Glines, supra*, 444 U.S. 348; *Greer* v. *Spock, supra*, 424 U.S. 828.) Additionally, the statute here provides for judicial relief by either party and for preference in hearing before all other matters when such a petition is filed with the court. (Elec. Code, § 10015.)

Merely because the statute requires the registrar-recorder to determine if the statement is obscene, vulgar, profane or contains defamatory or libelous matter does not make the statute thereby invalid. There are many instances where people must make those determinations. For example, in *F.C.C.* v. *Pacifica Foundation* (1978) 438 U.S. 726 [57 L.Ed.2d 1073, 98 S.Ct. 3026], the Supreme Court held valid the power of Congress to grant to the F.C.C. authority to sanction radio stations for the use of improper, indecent and obscene language. Among the several competing public interests discussed were protection of children in the home, the scarcity of radio spectrum, and the government's need to license this spectrum use in the public interest. Similarly, the high court in *Rowan* v. *Post Office Dept.* (1970) 397 U.S. 728 [25 L.Ed.2d 736, 90 S.Ct. 1484], upheld the statutory and administrative postal procedure which allows an addressee to determine whether matter mailed to him is obscene or personally offensive to him. If so, the postmaster can order the sender to desist. In *Rowan*, the recognized competing interests to be protected were similar to those in *F.C.C.* v. *Pacifica Foundation, supra*, 438 U.S. 726 [57 L.Ed.2d 1073, 98 S.Ct. 3026], i.e. (1) protection of recipients and their families (a type of captive audience) and (2) the right of privacy to be free of objectionable matter coming into the home whether by radio or by mail. Notwithstanding that a postal system available to all people is an important service of government, the misuse of the postal system by sending obscenity need not be tolerated under the claim of free speech.

Similarly the statute at bench is not unconstitutional simply because it allows the registrar to reject statements because of their content. The description of what may be rejected contains heretofore defined and accepted terms. Similarly, like obscenity, defamation may be hard to describe but that does not give it constitutional protection. (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997].)

Another aspect to be considered in determining the extent of constitutional protection of speech is whether it is "commercial." While traditionally commercial speech has been regarded as that which is done for profit such as in radio, newspaper, and television advertising, commercial speech is not necessarily limited to that type of speech. It may include presentation of campaign literature by a candidate. While any similarity may be disputed or the analogy rejected, precisely that

classification has been given to political advertising, by no less a feisty guardian of the right of free speech than the late Justice William O. Douglas concurring in *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [41 L.Ed.2d 770, 94 S.Ct. 2714].

In *Friedman* v. *Rogers* (1979) 440 U.S. 1 [59 L.Ed.2d 100, 99 S.Ct. 887], the court said that in addition to the restrictions on commercial speech as to time, place and manner of expression (explained in *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817]) certain restrictions on the *content* of commercial speech were not prohibited.

"In both *Virginia Pharmacy* and *Bates*, we were careful to emphasize that '[s]ome forms of commercial speech regulation are surely permissible.' *Virginia Pharmacy, supra*, at 770 . . .; accord. *Bates, supra*, . . . at 383 . . . . For example, restrictions on the time, place, or manner of expression are permissible provided that 'they are (justified) without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information.' *Virginia Pharmacy, supra*, at 771. Equally permissible are restrictions on false, deceptive, and misleading commercial speech.

"'Untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 340 (1974); *Konigsberg* v. *State Bar*, 366 U.S. 36, 49, and n. 10 (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information *flows cleanly as well as freely*.' *Virginia Pharmacy, supra*, at 771-772; 96 S.Ct., at 1830; accord, *Bates, supra*, 433 U.S. at 383, 97 S.Ct., at 2708." (*Friedman* v. *Rogers, supra*, 440 U.S. 1, 9 [59 L.Ed.2d 100, 109-110, 99 S.Ct. 887, 894].

The court in *Virginia Pharmacy* also noted that certain attributes of commercial speech indicate that it is " . . . appropriate to require that a

commercial message appear in such a form...as [is] necessary to prevent its being deceptive....They may also make inapplicable the prohibition against prior restraints." (*Va. Pharmacy Bd.* v. *Va. Consumer Council, supra*, 425 U.S. 748, 771-772, fn. 24 [48 L.Ed.2d 346, 364].)

In *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298, 307 [41 L.Ed.2d 770, 779, 94 S.Ct. 2714], the court held that a political candidate has no fundamental right under the First Amendment to compel the city-owned bus system to carry his campaign advertising. To Justice Douglas, concurring, the commuter's right of privacy was as important as the candidate's right to be heard. He weighed the right of the captive audience. Justice Douglas in his concurring opinion states: "In asking us to force the system to accept his message as a vindication of his constitutional rights, the petitioner overlooks the *constitutional* rights of the commuters. While petitioner clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it." (Italics added.)

From the foregoing, it seems certain that no one has a First Amendment constitutional right to "speak" in a voter's pamphlet, any more than a person has a constitutional right to speak at a military base, send anything he wants through the mail, or advertise on a city bus. Although the voter's pamphlet is paid for by the taxpayers and is part of the government-controlled activity, it is, like a military base, not a totally open public forum. (*Greer* v. *Spock, supra*, 424 U.S. 828, 836 [47 L.Ed.2d 505, 513].)

The majority opinion asserts that the state need not provide the candidates this "forum," via the voter's pamphlet, but once it has opened the forum, there cannot be any condition or restraint on the speech. This, of course, is in keeping with the teaching of *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77 [112 Cal.Rptr. 777, 520 P.2d 1], holding that if once made available to some by permission, public utilities poles acquired the status of the "open forum" upon which all persons could freely post messages. The cases cited by *Dulaney* as examples of "opening the forum" authority are: *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276]; *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982]; *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885]. Subsequent cases of the United States Supreme

Court have rejected the "opening of the forum theory" as a prohibition on restriction of speech. In *Marsh*, the high court held that the First Amendment permitted distribution of literature in a private company town, without the necessity of obtaining permission from the company, thus extending the doctrine of *Lovell* v. *Griffin, supra*, 303 U.S. 444, wherein it was held that religious pamphleteers need not obtain permission from the chief of police to distribute literature in public). The holding and effect of *Marsh* v. *Alabama* was subsequently narrowed in *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219]. There the court held that persons seeking to freely distribute literature on private property were not protected by the First Amendment against the right of the owner to prohibit such leaflet distribution. *Wirta* held that public buses which allowed other advertising were required to accept a political candidate's message under the "opened forum doctrine." Squarely contrary to *Wirta, Lehman* v. *City of Shaker Heights, supra*, 418 U.S. 298, held that there was no such right of a candidate for public office to use the public buses for the purpose of displaying his advertising. The court upheld the refusal of the city-owned bus system to carry advertising which was political in nature. *Danskin* held that the publicly owned school building traditionally available to public speakers was thus an open forum which could not be denied those who refused to take an oath that they were not "subversive" to the government. That basis of the "opened forum" theory has also been limited by the effect of the military base trilogy, cited earlier *Secretary of the Navy* v. *Huff, supra*, 444 U.S. 453; *Brown* v. *Glines, supra*, 444 U.S. 348; *Greer* v. *Spock, supra*, 424 U.S. 828, all holding that even though government-owned property, the use of which was allowed to some to speak and circulate literature, the commanders thereof could reject others who wished to petition or speak on political matters, thus limiting to some measure on free speech or right of petitioning.

In summary, the matter at bench is "different from the traditional settings where First Amendment values inalterably prevail [citations omitted]" (*Lehman* v. *City of Shaker Heights, supra*, 418 U.S. 298, 302 [41 L.Ed.2d 770, 777].) "Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the

Amendment to the speech in question." (*Id.* at pp. 302-303 [41 L.Ed.2d at p. 777].) At bench the statute provides that a public official shall reject certain described statements. The words of description used have been judicially determined and subject to definition. The statute provides for prompt, judicial review. There is no constitutional right to have a voter's pamphlet "forum." The "opened forum" theory has been soundly rejected and there are other important interests which offset any assertion to absolute right to say anything in the voter's pamphlet. Among those countervailing interests and considerations might be: (1) the right of the individual privacy to be free of unwanted comment; (2) the fact that the government is providing a privileged means of advertising at taxpayers' expense; (3) the "forum" was not heretofore traditionally known or used; (4) the need to avoid seemingly official sanction of improper comment; and (5) the effort to reduce possible involvement of the registrar-recorder or other public officers in campaign disputes or litigation arising from a campaign statement. Not all are equally important but most of these considerations justify the statutory scheme.

I am mindful that the majority state that part of the statute is invalid under both federal and state constitutional guarantees of speech. In that respect again, however, the majority rely entirely upon *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652 [119 Cal.Rptr. 468, 532 P.2d 116]. It is true that *Wilson* gives lip service to recognition of constitutional protections under the California Constitution broader than those under the federal Constitution: "A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press." (*Id.* at p. 658.) However, the *Wilson* court relied on both the state and federal Constitutions in support of its decision. A subsequent case, *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], seems to establish a new California precedent that the California Constitution does give a broader protection to free speech in California than does the federal Constitution. In its decision, *Robins* states: "Federal principles are relevant but not conclusive so long as federal rights are protected." (*Id.*, at p. 909.) It treats *Lloyd Corp.* v. *Tanner, supra*, 407 U.S. 551, as not controlling. However, on November 13, 1979, the United States Supreme Court granted certiorari in the *Robins* case. (444 U.S. 949 [62 L.Ed.2d 318, 100 S.Ct. 419].) Irrespective of what

the United States Supreme Court may say, California recognizes the inalienable right of privacy. (Cal. Const., art. I, § 1.) From this it would seem arguable that by California's separate state standards, such right of privacy is substantial and important enough of an interest and of *constitutional* recognition as to be entitled to protection. This protection should include being free from unwanted and unsolicited, libelous, defamatory, obscene or vulgar matters being thrust upon the voter through the use of a voter's pamphlet. The carrying of a candidate's advertising in a voter's pamphlet is a creation of statute. It is not a matter resting on constitutional right. The extent of the privilege to use the pamphlet must be balanced with the California constitutional right of privacy as well as the other interests already discussed. I therefore do not concur in the majority expression that the statute is in part unconstitutional.

A petition for a rehearing was denied March 26, 1980. Beach, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied April 30, 1980. Mosk, J., Manuel, J., and Newman, J., were of the opinion that the petition should be granted.