[No. G024266. Fourth Dist., Div. Three. Dec. 9, 1999.]

BARRY HAMMOND, Plaintiff and Respondent, v.
LARRY AGRAN, Defendant and Appellant.

COUNSEL

Kenneth D. Agran and Jan Rainbird for Defendant and Appellant.

Barry Hammond, in pro. per.; and Megan L. Wagner for Plaintiff and Respondent.

OPINION

**SILLS, P. J.**—The narrow issue on which this case turns is the scope of the word "qualifications" as used in the Elections Code statute governing the content of candidates' statements in voters' pamphlets. (See Elec. Code, § 13307, formerly Elec. Code, § 10012.) It is now established that the word does not encompass attacks on one's opponents. (See *Clark v. Burleigh* (1992) 4 Cal.4th 474, 488-489 [14 Cal.Rptr.2d 455, 841 P.2d 975].) But does it encompass a candidate's *ideas* or *platform*?

The answer is yes: The Legislature envisioned that a candidate's ideas and views (as distinct from attacks on opponents) could fairly constitute "qualifications" within the meaning of the statute. Indeed, common sense would lead to no other conclusion. It is hard to imagine, for example—if the candidate's statement had been around in the Presidential Election of 1860— that Abraham Lincoln's opinions about the expansion of slavery into the territories somehow didn't qualify him to be President, but his work and background as a prominent railroad attorney (work for which in general Lincoln is *not* remembered) did.

FACTS

Larry Agran, formerly a mayor and city council member of Irvine, ran again for the city council in the November 1998 General Election. In August 1998 he submitted a candidate's statement, which consisted of five paragraphs, centered on the general themes of his role of leading the city council in drafting Irvine's general plan, his fidelity to that plan, and his opposition to a commercial airport at a nearby marine base. We reproduce the entirety of the statement in the margin.[1] Barry Hammond, a political opponent of Agran's, then filed a petition for writ of mandate, contending that the middle

---

[1]Here is the statement:

"I was privileged to serve on the City Council from 1978 to 1990, including six years as mayor.

"I led the Council in drafting Irvine's General Plan—a blueprint for the future that clearly prohibited a commercial airport at El Toro. It also provided for safe and quiet neighborhoods,

three paragraphs of the statement contained "false, misleading and/or inconsistent information."[2] Hammond contended that Agran could not take credit for his role in the drafting of Irvine's general plan because he was not on the city council when its original general plan was enacted in 1973. He further argued that Elections Code section 13307, precluded his statement from expressing his views on the airport and jail, because they were "not related" to his qualifications.[3]

On August 25, the court held a hearing at which Agran himself testified. Hammond's counsel took the position that "ideas and point of view are not related" to candidates' "qualifications," saying that ideas could be used to attack another candidate or institution. The trial judge was not immediately persuaded, and asked, "If the qualifications aren't relevant to the voter's decision in casting their vote, what's the purpose of stating qualifications?"

Even so, after the hearing was concluded, the trial court ordered the middle paragraphs stricken in their entirety. The court indicated that it believed this court's decision in *Dean* v. *Superior Court* (1998) 62 Cal.App.4th 638 [73 Cal.Rptr.2d 70], and the Supreme Court's decision in *Clark* v. *Burleigh, supra*, 4 Cal.4th 474, both excluded "campaign statements" or "campaign planks" from the purview of the word "qualifications"

---

generous greenbelts, parks and recreation facilities, excellent schools, and thousands of acres of natural open space.

"As a former councilmember and attorney who specializes in public-interest law, I know this: We must stand together to defeat the County's airport and jail expansion plan. We must also replace it with the non-aviation Millennium Plan—a plan for El Toro that includes a 1500-acre central park and nature habitat, surrounded by colleges, libraries, museums and cultural attractions, along with an extension of our world-class research community at the Irvine Spectrum.

"Irvine is once again at a crossroads: Will we fulfill the promises we've made to ourselves and to future generations? Or will we permit County officials to destroy our General Plan?

"I'll do what it takes to defend and enforce Irvine's General Plan. That's why I'm asking for your vote. I'd be privileged to serve you again."

[2]In the statement set out in footnote 1, the *second* paragraph (beginning with, "I led the Council in drafting . . .") was designated by the trial court as paragraph "1," the third paragraph (beginning with, "As a former councilmember . . .") as paragraph "2," and the fourth paragraph ("Irvine is once again . . .") was considered paragraph "3."

[3]Elections Code section 13307, subdivision (a)(1) provides: "Each candidate for nonpartisan elective office in any local agency, including any city, county, city and county, or district, may prepare a candidate's statement on an appropriate form provided by the elections official. The statement may include the name, age and occupation of the candidate and a brief description, of no more than 200 words, of the candidate's education and qualifications expressed by the candidate himself or herself. However, the governing body of the local agency may authorize an increase in the limitations on words for the statement from 200 to 400 words. The statement shall not include the party affiliation of the candidate, nor membership or activity in partisan political organizations."

For a comprehensive statement of the operation of candidates' statements, see *Clark* v. *Burleigh, supra*, 4 Cal.4th at pages 478-479.

All statutory references are to the Elections Code.

as used in section 13307.[4] However, the trial court did allow Agran to prepare an overnight revision of the statement, which it accepted the next morning. The main difference between the two statements is that the new statement narrowed Agran's role in the city's general plan and contained no direct statement of opposition *qua* opposition to a nearby jail or airport; rather, it merely implied Agran's present opposition to a commercial airport through the device of mentioning his past work with an organization designed to "defeat the proposed international airport at El Toro." We also reproduce that statement in the margin.[5] Agran filed a timely appeal from the order.

---

[4]Here is the entirety of the trial court's comments after the matter was submitted:

"The court: Even though the definition proffered, that being a definition of 'qualifications' does have some appeal, it suffers from the same ambiguities that the word 'qualification' suffers. It's a bit like beauty. It's in the eye of the beholder.

"Certainly qualifications would go to skills and qualities. But what's relevant to the electorate in determining their vote creates another set of ambiguities.

"The court strikes paragraphs 1, 2, and 3 in their entirety. It is not the desire of this court to become the ultimate blue line editor of campaign statements.

"The court will entertain up to nine o'clock tomorrow morning a revision that comports with the holding in the Dean case.

"The court does so out of a position of equity because we're all trying to struggle with and work with what the appellate court really truly meant when they passed—when they gave us the holding in Dean.

"You'll submit [speaking to Agran's attorney] a copy of the proposed new statement to Mr. Sheldon [Hammond's attorney] by not later than 5:00 a.m. You may fax it to him.

"Do you have a fax number?"

Then, after an inquiry from Agran's counsel for "a little bit of guidance, your honor," the court went on:

"I'm not saying everything in here is—

"Mr. Mears [Agran's counsel]: I understand.

"The court: I'm just saying I've chosen not to be the blue line editor.

"Mr. Mears: I understand. [¶] By way of a little bit of guidance, do I understand the court to say that the chief problem that it sees with paragraph 3 and paragraph 4 is that the court views—

"The court: I only have them as 1, 2, and 3.

"Mr. Mears: 2 and 3.

"The court: And that's how we've referred to them in our record. I think they're pretty much sales puffing, if you will, campaign statements, campaign planks. They can be adequately addressed using the analysis which is in more detail in Burleigh, by the way, than it is in Dean as to what you can accomplish in other areas. [¶] Anything else?

"Mr. Mears: I don't think so, so your honor."

[5]The revised statement read:

"I was privileged to serve on the City Council from 1978 to 1990, including six years as Mayor.

"As Mayor, I led the Council in enacting the Conservation and Open Space Element of our General Plan, preserving thousands of acres of hillsides and canyons in their natural state, forever free of development.

"Since 1996, I've served as voluntary chairman of a non-profit citizens' organization working to defeat the proposed international airport at El Toro and replace it with the Millennium Plan—a comprehensive non-aviation reuse plan.

## DISCUSSION

### The Word "Qualifications" in Section 13307 Includes a Candidate's Views on Public Issues

#### The Case Is Not Moot

We may summarily dispense with a mootness contention made by Hammond based on the fact the election has already taken place.[6] ▮ The matter is obviously, as it was in *Clark* v. *Burleigh, supra,* 4 Cal.4th 474, an example of the rule that cases are not moot when they present questions capable of repetition yet evading review. (Cf. *Clark, supra,* 4 Cal.4th at p. 481 [rejecting mootness argument because matter was of "general public interest and likely to recur"].) Hammond's argument in favor of mootness is that there is no public interest in the case because the statute "plainly" excludes a candidate's viewpoints. That reasoning is both circular and wrong in its premise. It is circular because it is predicated on the assumption that Hammond is necessarily correct on the merits (as we show below, he isn't), and it is wrong in its premise because it assumes that the question of whether a candidate's views may be included in a candidate's statement has already been definitively determined (as we show below, it hasn't).

#### Prior Cases Did Not Decide the Issue

While *Clark* v. *Burleigh, supra,* 4 Cal.4th 474 tells us what "qualifications" does not include—it does not include attacking one's opponents—the case does not directly deal with the question of what *is* a qualification within the meaning of the statute. *Clark* involved a candidate's statement in a judicial election in which a municipal court judge running for superior court made direct negative references, by name, to the incumbent. The trial court excised the statement. Most of the *Clark* opinion is devoted to a thorough discussion of the *constitutionality* of the removal; the focus is the question of exactly what kind of "forum," for purposes of *constitutional* analysis, a candidate's statement is. (See *Clark, supra,* 4 Cal.4th at pp. 482-488.) Only in passing on that issue does it deal with the meaning of the statute.

"I am a Phi Betta Kappa graduate of the University of California, and an honors graduate of Harvard Law School. From 1970 to 1973, I was Legal Counsel to the State Senate Health and Welfare Committee. I've taught legislation and public policy at the UCLA School of Law and the UCI School of Management. I've also authored a book about the need to control cancer-causing substances in the workplace and the environment. I've lived in Irvine with my family for over 20 years.

"I'll do what it takes to defend and enforce Irvine's General Plan. That's why I'm asking for your vote. I'd be privileged to serve you again."

[6]Agran won a seat on the Irvine City Council.

What the high court did say about the meaning of the statute is mostly set forth in one paragraph spanning pages 488 to 489 in the official reporter. After previously concluding that candidates' statements fall into the last of three possible categories (i.e., not the "traditional public forum" or a "designated public forum," but a " 'remaining' " catchall category (see *Clark* v. *Burleigh, supra*, 4 Cal.4th at pp. 482-483)), the opinion tackles the question of "whether the Legislature, by creating the statutory 'candidate's statement,' intentionally opened a public forum that candidates for local judicial office may use for the purpose of attacking their opponents." (*Id.* at p. 488.) Answer: no. Because the statute "specifically lists the permissible contents" of the candidate's statement, the "negative implication of this specific list," said the *Clark* court, was that ". . . the Legislature did not intend the statutory candidate's statement to contain any other material." It cited the venerable rule of linguistic construction, *expressio unius est exclusio alterius*—i.e., having expressed the one thing, you must have meant to exclude what you left out. Then the court added that "[m]ore important" than this "implication" from linguistics was the "express" prohibition in another statute against candidates for *judicial* office from discussing " 'another candidate's qualifications, character, or activities.' " (See *id.* at p. 489, citing former § 10012.1 [now § 13308].)

The other part of the *Clark* opinion where the court touches on the meaning of the statute is toward the end, where the court is concerned with the reasonableness of the statute construed so as to preclude attacks on one's opponents. (See *Clark* v. *Burleigh, supra*, 4 Cal.4th at pp. 493-494.) Pointing out that local elections are "normally low-profile events" and candidates frequently do not have the "means" of informing the voters of their qualifications, the *Clark* court observed that the Legislature "created" the candidate's statement "[t]o help fill this informational void." (*Id.* at p. 493.) "From its terms and conditions," said the court, ". . . we may reasonably infer that its primary purpose is to give the voters at least a minimal amount—200 words' worth—of basic information about the background and qualifications of little-known candidates." (*Ibid.*) The court then went on to explain that, in light of the basic purpose of the statute (i.e., filling informational voids), there were three reasons the Legislature would not have wanted the statement to be used "as a partisan campaign device to attack" opponents. One, to prevent *confusion* caused by a "mixed" message; two, to prevent *displacement* of factual information about the candidate himself or herself given the limited amount of space available (200 words normally, at most 400 words); and three, to prevent *misuse* of the device by blindsiding an opponent who would not have time to answer the attack. (*Ibid.*)

Finally, on the next page and in the context of again explaining the constitutional adequacy of the statute as construed, the *Clark* court suggested

that even "attacks on opposing candidates" are not necessarily "wholly incompatible with the purposes of the statutory candidate's statement," but that the restriction was "at least reasonable" and the "governing decisions" of the federal Supreme Court required "no more" of the statute. (*Clark* v. *Burleigh, supra,* 4 Cal.4th at p. 494.)

Though the *Clark* court did not remark on the fact, the trial court in that case had not stricken a portion of the candidate's statement which dealt with only the candidate's views, as distinct from statements disparaging his opponent. It left in this statement: "It's time to get *tough with criminals* . . . time to end court *interference* in community affairs." (Compare *Clark* v. *Burleigh, supra,* 4 Cal.4th at p. 481, fn. 7 [what was stricken] with p. 497 [original statement].) While the *Clark* court did not discuss the question of candidate views per se in its opinion, it is at least noteworthy that the inclusion of the candidate's views in what was left of the statement was not so offensive that the high court felt compelled to reach out and comment on it adversely.

This court, in *Dean* v. *Superior Court, supra,* 62 Cal.App.4th 638, took *Clark*'s comments about attacking one's opponents and the statutory construction of the statute (i.e., the *expressio unius* language) and applied them to a *non*judicial race for county superintendent of schools. (See *Dean, supra,* 62 Cal.App.4th at pp. 641-642.) There we held that language attacking the incumbent should have been stricken as an "impermissible personal attack." (See *id.* at pp. 639, 641-642.) But that was *all* we held.

We did make a comment, in the introductory sentence to a paragraph in the opinion devoted to quoting the *expressio unius* passage from *Clark,* that "[t]he language of section 13307 is unambiguous," but that comment was in a *context* in which the issue was attacks on one's opponents, and we were taking our cue from what the Supreme Court had itself plainly said about the language of the statute in that precise context. *Dean* cannot be fairly read as saying that the word "qualifications" as used in section 13307 unambiguously excludes candidate's viewpoints—as we show in the next section, it doesn't do any such thing.[7]

One other case bears comment at this point, though it deals with an issue that was not before the court in either *Clark* or *Dean: Loza* v. *Panish* (1980)

---

[7]The trial judge in *Dean* was the trial judge in the present case. In light of the fact that *Dean* resulted in a peremptory writ being issued when he didn't strike the challenged language, it is understandable that he might have been inclined to overread *Dean* so as not to make the same error again—and indeed, comments from the bench during the hearing reveal as much. (The court said in colloquy with Hammond's counsel: "This is the difficulty of this whole doggone area and the reason why I ruled the way I did when I ruled in the Dean case. But we lost that battle, sir. That battle is over with.")

102 Cal.App.3d 821 [162 Cal.Rptr. 596]. *Loza* was, until *Clark*, the only California decision dealing with the meaning of the candidate's statement statute. *Loza* held that a portion of the statute, requiring the clerk to reject certain kinds of scurrilous or inflammatory language,[8] was unconstitutional. (See *Loza, supra*, 102 Cal.App.3d at p. 826.) While the statutory prohibition on certain kinds of scurrilous language dealt with in *Loza* was not at issue in *Clark*, the *Loza* opinion did discuss a significant—and we think correct— inference about the Legislature's intent about the construction of the word "qualifications," from the presence of the (now unconstitutional) prohibition: namely, that "a candidate's statement may include information regarding his qualifications which *goes beyond mere personal data* respecting his name, age, occupation and education." (*Loza, supra*, 102 Cal.App.3d at p. 824, italics added.) We explain why that inference is correct below.

### The Ordinary Meaning of the Word "Qualifications" Can Encompass a Person's Views

■ The word "qualifications" is not otherwise defined by the statute, and in the absence of specifically defined meaning, a court looks to the plain meaning of a word as understood by the ordinary person, which would typically be a dictionary definition. (See *Scott* v. *Continental Ins. Co.* (1996) 44 Cal.App.4th 24, 28-30 [51 Cal.Rptr.2d 566] [and listing authorities using general dictionaries to ascertain " 'ordinary' meaning of words used in a statute"].) ■ The Oxford English Dictionary lists a number of definitions of the word "qualification," only one of which is the one which Hammond would have us restrict its meaning to, namely, an "accomplishment." (See 12 Oxford English Dict. (1989) p. 971.) In connection with that which "qualifies or fits a person for some office or function," the dictionary lists both "quality," *and* "accomplishment" under the word (*ibid.*), indicating that something other than mere résumé material can be a "qualification."

Thus it is not uncommon that, in the context of fitness for "office or function," there are occasions when the word necessarily encompasses viewpoints, ideas or ideology. One of the most common is in the context of the criminal law and the death penalty. In *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1177 [9 Cal.Rptr.2d 834, 832 P.2d 146], our Supreme Court wrote, "A juror is not *qualified* to serve in a capital case if his or her *views* about the death penalty would ' "prevent or substantially impair the performance of his

---

[8]The language was: "The clerk shall reject any statement, which contains any obscene, vulgar, profane, scandalous, libelous or defamatory matter, or any language which in any way incites, counsels, promotes or advocates hatred, abuse, violence or hostility toward, or which tends to cast ridicule or shame upon any person or group of persons by reason of sex, race, color, religion or manner of worship, or any language or matter the circulation of which through the mails is prohibited by Congress." The language was deleted in 1983. (See Stats. 1983, ch. 882, § 1, pp. 3203-3204.)

duties as a juror in accordance with his instructions and his oath." ' " (Italics added.) Other criminal decisions have also said that a person is disqualified from serving on a jury if he or she belongs to an ideologically or politically—to the degree the words do not overlap—oriented organization, such as the "know-nothing party," if such membership might reify itself as a prejudice against a particular defendant. (See *People* v. *Buyle* (1937) 22 Cal.App.2d 143, 146 [70 P.2d 955] [and cases mentioned therein].)

Likewise, when loyalty oaths were an issue in public employment and benefits law, the Supreme Court regularly confronted the question of whether a given loyalty oath (to wit, that the person was willing to swear that he or she had not, nor had ever been, a Communist) had, in a certain context, "a direct bearing on the qualification necessary for the employment or other benefit under consideration." (See *Wilson* v. *City of Los Angeles* (1960) 54 Cal.2d 61, 64 [4 Cal.Rptr. 489, 351 P.2d 761].) Thus the Supreme Court in 1960 could acknowledge that there were times when there was a relationship between the "political affiliations and beliefs" of an applicant and "the qualification of the applicant."[9] (*Ibid.*; see also *In re Anastaplo* (1961) 366 U.S. 82, 90 [81 S.Ct. 978, 983, 6 L.Ed.2d 135] [stating ". . . it is of no constitutional significance whether the State's interrogation of an applicant on matters relevant to these qualifications—in this case Communist Party membership—is prompted by information which it already has about him from other sources, or arises merely from a good faith belief in the need for exploratory or testing questioning of the applicant"].) In that era both Chief Justice Traynor and Justice McComb found occasion in dissenting opinions to impliedly or directly acknowledge that there will be at least some occasions when *beliefs* constitute a "qualification." (See *Konigsberg* v. *State Bar* (1959) 52 Cal.2d 769, 776 [344 P.2d 777] (dis. opn. of Traynor, J.) ["a question as to present or past membership in [the Communist Party] is relevant to the issue of possible criminal advocacy and hence to the applicant's qualifications"]; *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 555 [343 P.2d 36] (dis. opn. of McComb, J.) [". . . the free press' foremost obligation is to advise the electorate of all the qualifications or disqualifications of each candidate for public office, which obviously includes his party affiliations, be they communist or otherwise . . . ."].)

---

[9]Here is the relevant text of the court's discussion: "In instances in this state where courts have sustained requirements that those seeking to obtain or seeking to retain public employment or other public benefits are required to subscribe to a so-called loyalty oath they have uniformly done so on the rationale that the state or municipality has a right to inquire into the applicant's qualifications, and that *loyalty has a direct bearing on the qualification necessary* for the employment or other benefit under consideration. [Citations.] But where there is no rational and substantial connection between the nature of the investigation into loyalty and the qualification of the applicant an inquiry which requires that he disclose his political affiliations and beliefs constitutes an unreasonable and capricious infringement on the freedoms protected by the Fourteenth and First Amendments of the federal Constitution and article I, section 9 of the California Constitution." (*Wilson* v. *City of Los Angeles, supra,* 54 Cal.2d at p. 64, italics added.)

Given the breadth of the word, it would be inconsistent with the plain meaning of the statute—indeed, perhaps even somewhat elitist—to confine the idea of "qualifications" for office to résumé items like degrees and experience in a profession. No matter whether the candidate be a rabble-rouser on a soapbox who never finished high school, or the appellant in the case before us—an honors graduate of Harvard Law School—his or her *ideas* are often the most important "quality" in many voters' minds. One voter's "qualification" may be another voter's "disqualification." While most appellate and trial judges would, for example, consider a law degree to be a "qualification" for office, many voters might be decidedly disaffected by a candidate's law degree;[10] then again, they might otherwise be persuaded by the candidate's opinion about whether to raise taxes to fund new educational programs. The filling of the "informational void" about candidates of which the *Clark* court wrote is better done with information about a candidate's ideas—which, after all, provide at least some clue as to how he or she will act and vote while in office—than with his or her résumé.

### *The Legislature Impliedly Contemplated That Qualifications Would Include More Than Mere Résumé Material*

As originally enacted, the candidate's statement statute had a provision which required the clerk to strike scurrilous material which advocated or promoted hatred or hostility toward not only any given person, but toward any "group of persons by reason of sex, race, color, religion or manner of worship." (The language is quoted in full in fn. 8, *ante*.) That language was declared unconstitutional in 1980 by the *Loza* decision, and by 1983 the Legislature removed it from the statute. One of the contentions in *Loza* was that the qualification language of the statute—which was unaffected by the court's ruling—"*confine[d]*" (original italics) the candidate's statement to data "having solely to do with the candidate." (See *Loza* v. *Panish*, supra, 102 Cal.App.3d at p. 824.) Accepting the "appellant's assertion there is no adequate legislative history associated with the statute in question which would itself provide the means for resolution of the parties' respective arguments on this point," the *Loza* court observed, in language we have also quoted above, that on the basis of "familiar" principles of statutory construction, the statement might indeed include information regarding a candidate's qualifications "which goes beyond mere personal data." (*Ibid.*)

It is inescapable that the Legislature, when it originally enacted the statute *with* a prohibition against attacks based on certain kinds of prejudice, was

---

[10]Thomas Jefferson once lamented the fact that Congress was filled with lawyers. As he wrote in his autobiography, "If the present Congress errs in too much talking, how can it be otherwise, in a body to which the people send one hundred and fifty lawyers, whose trade it is to question everything, yield nothing, and talk by the hour?" (See The Life and Selected Writings of Thomas Jefferson (Random House 1944) p. 61.)

sufficiently worried that the candidate's statement was susceptible to such misuse that an express prohibition was needed against certain kinds of statements outside of mere résumé material. But by the same token, the Legislature was also signaling that *other* kinds of statements also beyond mere résumé material were contemplated under the statute. Of course, such statements would not extend to statements about one's opponent as distinct from one's own ideas or beliefs. As the *Clark* court intimated, you cannot claim as one of your own qualifications the fact your opponent is so bad.

### A Candidate's Views on the Issues Does Not Constitute an "Attack" on an Opponent

*Clark* identified three grounds which made an exclusion of attacks on one's opponent reasonable in the context of a candidate's statement: prevention of confusion, displacement and misuse. None of these concerns, however, are implicated by a statement of a candidate's own views at least where, as in the present case, the statement contains no direct criticism of another candidate.[11]

First, one's views *qua* views, stated without reference to one's opponent are one's own; there is no possibility a voter will be confused.[12] Second, given the necessary brevity of the statement, the implication is that only the most important information should be given. It is untenable to argue that compatible opinions—as distinct from résumé items—are not, in many voters' minds, the most important quality they look for in making an elective decision. For many voters, it is far more important to know whether you will raise taxes or increase regulations than it is to know what school you went to or what little league teams you coached. Third, there is no possibility of blindsiding an opponent, because a candidate is always in complete control of what his or her views are at any given time (though it is true that with some candidates it seems that their opinions vary by the hour).[13]

Hammond argues that Agran's original statements, by suggesting that "county officials" were in the process of pushing an unwanted airport on the

---

[11]Agran's statement that "[w]e must stand together to defeat the County's airport and jail expansion plan" straightforwardly sets forth his own views, and contains no comparison, even implied, of his opponents' views. A harder case, under *Clark*, would be a situation in which a candidate's statement of his or her views could not be read without an attack on an opponent—e.g., "I am the only candidate in this election who opposes an airport at El Toro," or "I am the only candidate in this election who is opposed to Soviet expansionism; my opponents are all soft on Communism." Fortunately, in this case we need not map the exact perimeters, under *Clark*, of where an honest statement of one's views ends and an attack on one's opponent begins.

[12]Again, we do not tackle the somewhat harder case of statements of views used as a subterfuge for an attack on one's opponent.

[13]Again, we limit our discussion to instances in which the statement of views does not refer to one's specific opponents. We are about to discuss comments about institutional interests.

residents of Irvine, somehow was an "attack" on those officials prohibited by *Clark*. The argument takes too restrictive a view of "views." Opposition to various general *institutional* figures and interests—be they Freemasons, "big business," the "power elite," "the international communist conspiracy," or "economic royalists"—has always been a staple of American political life. It is one thing to say one is a stalwart anti-Communist, and that such a belief qualifies one for some office, quite another to allege that one's opponent is a secret colonel in the KGB. Being against slavery generally—or even the plans of slave owners to expand the institution of slavery into new territories—is not the same thing as trying to get elected on the fact that one's opponent once owned a slave. Fairly read, Agran's reference to the plans of county officials was not, in context, an attack on a political opponent, but a way of expressing his ideas about certain concrete land use proposals of extreme relevance to his potential constituents.

Hammond's additional argument that the portion of Agran's statement concerning his leadership of the city council in drafting the city's general plan was "misleading" is a makeweight: The remarks of the trial court show that it was concerned with the purview of the word "qualifications," not any factual inaccuracy in Agran's statement. In any event, the statement was not inaccurate. Because a general plan is a document where changes and amendments are, as Agran's counsel nicely phrases it, continually "integrated" into its text, the average reader would understand the words "general plan" to be the one currently in use, not a version from more than 20 years ago. And as for "leading" the city council, the fact is that Agran was the mayor of the city during much of his tenure on the city council. And if a mayor cannot be said to "lead" a city council, no one can.

### DISPOSITION

It was error for the trial judge to have stricken the challenged language from Larry Agran's candidate's statement. The order is reversed with directions to enter a new order declaring that the language should not have been stricken.

Finally, there is the matter of attorney fees for this appeal. Agran spends a large amount of his brief arguing for an award of attorney fees against Hammond (and only Hammond[14]) under the private attorney general statute (Code Civ. Proc., § 1021.5) in the event he prevailed (as he now has) on the merits of his appeal. For his part, Hammond has only offered token opposition to the attorney fee question in the event he lost (as he also now has) on the merits.

---

[14]At oral argument Agran's counsel disavowed any attempt to seek his fees from the Orange County Registrar, the City of Irvine, or otherwise from the fisc.

*Whether* attorney fees should ever be awarded for litigation arising out of challenges to candidates' statements is, however, a problematic matter indeed.[15] No published decision of which we are aware has ever awarded attorney fees in such a context. And perhaps with good reason. The issue is fraught with grave implications beyond the narrow facts of this case, such as the interrelationship between any kind of public financing of elections and free speech.

Fortunately, the task is premature. The procedural posture of this case—Hammond did, after all, *win* at the trial level—virtually demands that the matter of whether Agran should be awarded any fees for this appeal (and if so, how much), be remanded to the trial court for consideration in the first instance. We have no record or briefing, for example, that even touches on how the "burden of private enforcement" (to borrow a phrase from section 1021.5 of the Code of Civil Procedure) will interact with the *statutory* right under section 13313 (formerly § 10013.5) to challenge candidates' statements. Nor do we have any record or briefing as to how the ability to challenge a candidate's statement under section 13313 in *combination* with the possibility of a fee award after the litigation is over might affect a candidate's First Amendment rights.

In short, given the extraordinarily complex and unbriefed questions inherent in Agran's request, the issue is not ripe. The matter is therefore remanded for further proceedings in light of this opinion.

Crosby, J., and Bedsworth, J., concurred.

---

[15]Challenges to such statements are allowed by section 13313, formerly section 10013.5, for material that is "false, misleading, or inconsistent with the requirements" in the chapter of the Elections Code dealing with voter pamphlets.