Filed 2/3/22  Rodriguez v. Eisenhower Medical Center CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| LEONOR RODRIGUEZ, | |
| Plaintiff and Appellant, | E075172 |
| v. | (Super.Ct.No. PSC1706058) |
| EISENHOWER MEDICAL CENTER, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Sunshine S. Sykes, Judge. Affirmed.

McCune Wright Arevalo, Richard D. McCune, Michele M. Vercoski, Steven A. Haskins and Tuan Q. Nguyen for Plaintiff and Appellant.

Jones Day and Nathaniel P. Garrett for Defendant and Respondent.

1

Plaintiff Leonor Rodriguez appeals from a judgment dismissing her complaint against defendant Eisenhower Medical Center after the trial judge granted the hospital's motion for summary judgment. Rodriguez alleged Eisenhower violated California's Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) by failing to adequately disclose the facility fee associated with her outpatient procedure. She alleged she would have gone elsewhere for the procedure had she known of the fee.

In granting Eisenhower's motion, the judge concluded the evidence indisputably demonstrated the hospital complied with the applicable pricing disclosure obligations contained in Health and Safety Code section 1339.51[1] (part of the "Payers' Bill of Rights") and thus had acted both lawfully and fairly under the UCL. Rodriguez argues the judge misinterpreted the evidence and dismissed her lawsuit in error. We disagree and affirm.

# I

# FACTS

A.    *The Payers' Bill of Rights*

A hospital's duty to inform patients about anticipated pricing before they receive treatment is defined by a series of statutes in the Health and Safety Code called the Payers' Bill of Rights. (§ 1339.50 et seq.) Enacted in 2003, the Payers' Bill of Rights recognizes the importance of pricing transparency and endeavors to strike a balance between a consumer's right to make informed choices and the burden of disclosure on

---

[1] Unlabeled statutory citations refer to the Health and Safety Code.

2

hospitals. In this vein, the Payers' Bill of Rights does not require hospitals to directly disclose anticipated fees and charges to patients in all circumstances. Rather, pretreatment disclosures are required only when an uninsured patient seeks a nonemergency service. (§ 1339.585.)[2]

In all other circumstances, a hospital meets the Legislature's standard of pricing transparency by giving patients access to a "uniform schedule of . . . its gross billed charge for a given service or item, regardless of payer type." (§ 1339.51, subd. (b)(1).) This schedule is called a "charge description master" or "chargemaster," and should contain a "list of all the billable medical goods or services" a hospital provides. (*Sarun v. Dignity Health* (2019) 41 Cal.App.5th 1119, 1125.)

There are two requirements for providing adequate chargemaster access under the Payers' Bill of Rights—availability and notice. A hospital must make "a written or electronic copy of its charge[master] available, either by posting an electronic copy . . . [on its] Web site, or by making one written or electronic copy available at the hospital location." (§ 1339.51, subd. (a)(1).) A hospital must also "post a clear and conspicuous notice in its emergency department, if any, in its admissions office, and in its billing office that informs patients that the hospital's charge[master] is available in the manner described in subdivision (a)." (§ 1339.51, subd. (c).) The Legislature imposed these disclosure obligations with the goal that "making public the chargemaster . . . will bring

---

[2] While this appeal was pending, the Legislature amended section 1339.585 to remove the condition that the uninsured patient request the fee disclosure. (See former § 1339.585.) Now, a hospital must provide the disclosure whether or not the patient requests it.

3

more transparency to hospital billing practices." (Assem. Com. On Appropriations, 3d reading analysis of Assem. Bill No. 1637 (2003-2004) as amended May 23, 2003, p. 2.)

B.    *Rodriguez's Lawsuit*

Eisenhower is a licensed hospital that provides 24-hour inpatient care at its main campus in Rancho Mirage and also maintains a number of outpatient facilities in the low desert area. In 2014, 2015, and 2016, Rodriguez underwent elective hyaluronic acid knee injections for the treatment of arthritis at one such outpatient facility, the Desert Orthopedic Center (DOC) in La Quinta.

In November 2018, Rodriguez filed the operative complaint in Riverside Superior Court, a putative class action lawsuit alleging that she and others similarly situated who received treatment at the DOC were charged a "facility fee" which Eisenhower failed to adequately disclose under section 1339.51. Specifically, she alleged the hospital failed to post a copy of their chargemaster on their web site and failed to post chargemaster notices in the required areas (emergency, administrative, and billing departments) as well as in the DOC. She alleged these violations of section 1339.51 constituted both unlawful and unfair business practices under the UCL.

According to the factual allegations in her complaint, Rodriguez received three knee injections in 2014 and another three in 2015. On each of those occasions, DOC staff provided her with a "Conditions of Admissions" form advising she would be billed both a "provider" fee and a "facility" fee for each visit. At that time, she was covered by an

4

HMO insurance policy through Healthnet under which she paid a minimal copay amount for each visit.

In 2016, Rodriguez switched to a PPO insurance policy through Anthem Blue Cross. She informed DOC staff about the change, and, after looking into her new policy, they contacted her to let her know the injections were still covered. That year, the total of Rodriguez's out-of-pocket medical bills for the three injections was $3,810, and she believed the facility fees made up about $3,489 of that total.

Rodriguez alleged she was harmed by Eisenhower's failure to adequately disclose their facility fee, because had she known the amount she was going to be responsible for under her new insurance policy, she would have either switched back to her previous policy or "sought medical care at a medical office not owned by a hospital," as facility fees are unique to hospitals.

C.      *Eisenhower's Motion for Summary Judgment*

After the parties engaged in discovery, Eisenhower filed a motion for summary judgment, arguing Rodriguez's UCL claim failed because the undisputed evidence showed they had complied with section 1339.51's disclosure requirements. In support of their argument, Eisenhower attached a declaration from Hallary Scheideman, their chargemaster coordinator and analyst, who is responsible for maintaining and updating their chargemaster. Scheideman said she prepared Eisenhower's chargemaster in 2016,

5

submitted it to the Office of Statewide Health Planning and Development (OSHPD), and "arranged for a copy of it to be available for viewing at the hospital."[3]

Eisenhower also submitted a declaration from their director of patient access, Michael Sythe, who is responsible for posting the hospital's chargemaster notices. Sythe said in 2016, Eisenhower had notices alerting patients to the availability of their chargemaster in their "admitting area," "emergency department," and "billing office." Eisenhower also submitted a copy of the notice entitled "Payer's Bill of Rights Chargemaster." The notice contains the following message in English and Spanish: "The *Payer's Bill of Rights* requires that hospitals make available to the public a master listing of retail prices for its services, known as the chargemaster. [¶] This facility's chargemaster is available for your inspection. To make an appointment to view the hospital's chargemaster or obtain a list of the 25 most common outpatient procedures, please contact the Admissions Manager at 760-837-8974."

Rodriguez opposed Eisenhower's motion and attached deposition testimony from Scheideman and Sythe that she argued undercut the hospital's claim of section 1339.51 compliance. During her deposition, Scheideman elaborated on how she had "arrange[d] for a copy of the Chargemaster to be available for viewing at the hospital." She explained she had placed an electronic copy of the document in the hospital's shared drive. She said the admissions department employees have access to the shared drive and can open the

---

[3] The Payers' Bill of Rights also requires hospitals to submit their chargemasters to the OSHPD on an annual basis. The OSHPD then makes those documents available to the public by posting them on their web site. (§§ 1339.55 & 1339.56, subd. (a).)

chargemaster with their login credentials (username and password). During his deposition, Sythe wasn't able to elaborate on precisely what would happen if a person followed the directions on Eisenhower's chargemaster notice and called the admissions manager to make an appointment to view the chargemaster. This was because it had never happened before; no patient had ever asked to see the chargemaster. Sythe's testimony also made it clear that Eisenhower posted only two copies of the notice in their hospital or main campus—one in the emergency department and one in the "admissions/billing area."

Rodriguez also submitted the deposition testimony of Lilian Hoag, Eisenhower's Director of Operations, who said there is no chargemaster notice posted at the DOC.

In reply, Eisenhower submitted deposition testimony from Sythe explaining they posted only two notices (as opposed to three) because of the main campus's layout. Sythe said Eisenhower's billing area is located *within* the admissions area. He also said that any patient who visits billing would necessarily walk past the chargemaster notice in the admissions area because you can't reach billing without going through admissions.

After a hearing on Eisenhower's motion, Riverside Superior Court Judge Sunshine S. Sykes concluded Rodriguez's claim failed under both theories, unlawful business practices and unfair business practices. As to unlawful practices, the judge found the undisputed evidence showed the hospital had complied with both the availability and notice requirements in section 1339.51. As to unfair practices, the judge concluded the theory failed because it was based on the same alleged conduct as the unlawful practices

7

theory. Whether Eisenhower should have posted their chargemaster notice in more locations than required by section 1339.51, the judge reasoned, was "for the Legislature to determine."

The judge granted Eisenhower's motion and, on March 19, 2020, entered judgment in their favor. Rodriguez timely appealed.

## II

## ANALYSIS

Rodriguez contends the trial judge incorrectly determined there was no triable issue of fact on her UCL claim. She argues she presented triable issues of fact in the following three areas: (1) whether Eisenhower's chargemaster was truly "available" within the meaning of section 1339.51, subdivision (a); (2) whether the practice of posting only one chargemaster notice in a combined admissions/billing area satisfies the notice requirement in section 1339.51, subdivision (c); and (3) whether Eisenhower's disclosure methods constitute unfair practices, even if not unlawful.

### A. *General Legal Principles*

#### 1. *Standard of review*

A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine

whether, despite their allegations, trial is in fact necessary to resolve their dispute."

(*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

A defendant who moves for summary judgment bears the initial burden to show the action has no merit—that is, "one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subds. (a), (p)(2).) If they clear this initial hurdle, the burden shifts to the plaintiff to demonstrate a triable issue of material fact. (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851.) We independently review an order granting summary judgment, and if the issue involves a question of fact, we view the evidence in the light most favorable to the nonmoving party. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)

### 2. *The UCL*

The purpose of the UCL is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." (Bus. & Prof. Code, § 17001.) To achieve this goal, the law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code, §§ 17200, 17203, 17204.) An "unlawful" act or practice is "anything that can properly be called a business practice and that at the same time is *forbidden by law*."

9

(*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*), italics added.)

As for what constitutes an "unfair" act or practice, the *Cel-Tech* court found the definitions in prior cases "too amorphous and provid[ing] too little guidance to courts and businesses" and so articulated a more concrete definition of unfair in actions between competitors (as opposed to cases, like this one, brought by a consumer).[4] (*Cel-Tech*, *supra*, 20 Cal.4th at p. 185.) "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Id.* at p. 187.) In other words, the alleged unfair act must be "tethered to some legislatively declared policy." (*Id.* at p. 186.)

After *Cel-Tech*, a split of authority developed among the Courts of Appeal for the appropriate unfairness test in a *consumer* action. This district uses the definition of unfair articulated in *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854, which essentially imports Cel-Tech's competitor test. "[W]here a claim of an unfair act or practice is predicated on public policy, . . . the public policy which is a predicate to the

---

[4] The prior cases used concepts like "immoral, unethical, oppressive, unscrupulous [and] substantially injurious to consumers" to define unfair. (E.g., *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530.)

10

action must be 'tethered' to specific constitutional, statutory or regulatory provisions."**5** (See *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 613; *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940.)

> B. *Unlawful Practices*

As we've seen, section 1339.51 requires a hospital to make a written or electronic copy of their chargemaster available online or at their hospital location, with notices posted in the emergency department, admissions office, and billing office, that the schedule is so available. Where, as here, a hospital chooses to use an electronic copy, the hospital must either post the document on their web site or make it "available at the hospital location." (§ 1139.51, subd. (a).)

> 1. *Availability*

Beginning with the availability requirement, it's undisputed that Eisenhower kept an electronic version of the chargemaster at their main campus or "hospital location." Scheideman said she created the chargemaster and placed it in Eisenhower's internal shared drive, where admissions department employees can access it with their login

---

**5** Other courts apply a pre-*Cel-Tech* balancing test that weighs the utility of the company's practice against the gravity of harm to the victim. (E.g., *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718-719; *Davis v. Ford Motor Credit Co. LLC* (2009) 179 Cal.App.4th 581, 595.) Others adopt the test from section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(n)): "(1) [t]he consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." (E.g., *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403.)

11

credentials. Rodriguez argues this evidence does not sufficiently demonstrate the document was available to the public because it was password-protected. We disagree.

When a statutory provision does not define the term at issue, we look to "the plain meaning of a word as understood by the ordinary person, which would typically be a dictionary definition." (*Hammond v. Agran* (1999) 76 Cal.App.4th 1181, 1189.) Section 1339.51 does not specify what it means to make a chargemaster "available," but our Supreme Court has described the plain meaning of the word as "'capable of being made use of, at one's disposal, within one's reach,'" or "'obtainable.'" (*People v. Rodriguez* (2016) 1 Cal.5th 676, 686.)

The record contains no evidence suggesting a patient would be incapable of viewing Eisenhower's chargemaster by following the instructions in the notice, that is, by contacting the admissions manager and asking to see the document. The fact an employee would need to enter their login credentials upon such a request does not change the nature of the document. These days, one would be hard-pressed to think of a document or application that doesn't require login credentials. Considering that many people need them just to watch TV—and an admissions department employee would likely need them to simply log on to a hospital computer—we don't think login credentials qualify as the kind of obstacle that would make something unavailable under a common understanding of the word. In this context, the extra step is minimal, likely adding a few seconds to the patient's request.

Rodriguez's argument appears to be that an electronic copy of a chargemaster is not truly available unless it is stored on a public-facing terminal, but if that were the case section 1339.51 wouldn't have given hospitals any options for making an electronic copy available other than posting it to their web site. Because the statute does not specify the manner in which a hospital can make an electronic copy available "at the hospital location" (§ 1139.51, subd. (a)), and because Rodriguez hasn't produced any evidence suggesting the chargemaster was in fact unobtainable (such as evidence an employee was unable to access the document or refused to show it to a patient who asked), we conclude she hasn't demonstrated a factual dispute. In other words, the trial judge's assessment of the evidence was correct.

        2.    *Notice*

Next, Rodriguez argues Eisenhower's failure to post a chargemaster notice in their billing area constitutes a violation of section 1339.51's notice requirement.

The facts concerning this issue are undisputed. Eisenhower posted one notice in their emergency department and one notice in their combined admissions and billing area. In addition, Eisenhower's billing area is located *within* its admissions department such that anyone who visits billing must walk through admissions and past the notice posted there. The dispute is whether this practice satisfies the hospital's statutory obligation. Rodriguez argues section 1339.51 requires three *notices*, no exceptions. Eisenhower contends the statute requires notices in three *areas*, which, depending on a hospital's layout, may require less than three notices.

13

We think Eisenhower has the better argument. In our view, the purpose of section 1339.51's notice requirement is plain: to ensure that patients have a reasonable opportunity to see a chargemaster notice on any given visit to the hospital. The statute achieves this purpose by requiring notices in the areas of a hospital a patient is most likely to visit. Thus, if by virtue of a hospital's layout any of those three areas share the same space, we think the hospital satisfies its statutory obligation by posting a notice in the one area a patient will necessarily pass. Because the evidence demonstrates Eisenhower did that, we conclude the trial judge was right to find they complied with the notice requirement in section 1339.51, subdivision (c).

C.      *Unfair Practices*

Finally, Rodriguez argues the trial judge erred by granting summary judgment on the unfair practices theory of her UCL claim. She asserts two grounds for the error— (i) that Eisenhower failed to provide adequate notice they were moving on this theory and (ii) the evidence demonstrates Eisenhower's disclosure methods are unfair even if lawful. We disagree on both points.

According to Rodriguez, the trial judge was obligated to deny summary judgment because Eisenhower's motion focused on the lawfulness of their conduct and didn't address fairness. But that is not the test for whether an issue is properly before a judge on summary judgment. Rather, a judge "may grant summary judgment on a ground not specifically tendered by the moving party, so long as the opposing party has notice of and an opportunity to respond to that ground." (*Bacon v. Southern Cal. Edison Co.* (1997) 53

14

Cal.App.4th 854, 860.) A nonmoving party will be considered to have notice and an opportunity to respond where they address the issue in their opposition and attempt to show the existence of a factual dispute. (*Ibid.*)

That was the case here. Rodriguez raised the unfair practices theory in her opposition and argued the evidence she presented to show Eisenhower violated section 1339.51 "constitutes both 'unlawful' and 'unfair' business practices under the UCL," and Eisenhower then responded to this argument in their reply. Plus, both parties addressed the unlawful practices theory at length during the summary judgment hearing. Under these circumstances, it cannot be said the issue wasn't properly before the judge. In any event, Rodriguez hasn't identified any evidence she could have produced on the issue had Eisenhower raised it in their opening brief. Her argument is premised solely on the hospital's failure to address her alternate theory in their moving papers. But the law in this area is clear, "[t]o require the trial court to close its eyes to an unmeritorious claim simply because the operative ground entitling the moving party to summary judgment was not specifically tendered by that party would elevate form over substance and would be inconsistent with the purpose of the summary judgment statute." (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 69.) We therefore conclude the issue was properly before the judge and she was correct to rule on it.

Turning to Rodriguez's second challenge—whether the substance of that ruling was correct—we conclude it was. Rodriguez's complaint bases both the unlawful and unfair theories of liability on the same conduct: Eisenhower's alleged failure to make its

15

chargemaster available to the public and post notice about that availability. During the summary judgment hearing, Rodriguez argued Eisenhower's failure to post chargemaster notices at their outpatient facilities constitutes an unfair business practice, even if technically lawful. The trial judge concluded this was an issue for the Legislature, and we agree.

*Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401 is instructive. In that case, the patient alleged a hospital engaged in unfair business practices in violation of the UCL by failing to affirmatively disclose, before treatment, the existence and amount of a facility fee. Like here, the plaintiff had not alleged the facility fee itself was unlawful, only that the hospital's failure to directly disclose it to him before his treatment constituted an unfair business practice. (*Nolte*, at pp. 1407-1408.) The appellate court disagreed, concluding that when a hospital complies with the disclosure obligations under section 1339.51, failing to directly disclose a facility fee to the patient, pretreatment, doesn't amount to the kind of "'sharp practice'" the UCL targets. (*Nolte*, at pp. 1407-1408, quoting *Searle v. Wyndham Internat., Inc.* (2002) 102 Cal.App.4th 1327, 1334.)

That conclusion applies with equal force here. Section 1339.51 represents a considered judgment from our lawmakers about a hospital's duty to make pretreatment disclosures about anticipated or potential charges. Expanding the scope of that duty to include outpatient facilities would upset the balance the Legislature chose to strike between a consumer's right to information and a hospital's burden of providing it, and we

16

decline to substitute our judgment for the Legislature's. (See *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53 ["The judiciary, in reviewing statutes enacted by the Legislature, may not undertake to evaluate the wisdom of the policies embodied in such legislation; absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function"].) Pricing transparency is important and we are not unsympathetic to Rodriguez's claim that Eisenhower's disclosure methods do not, in practice, do enough to alert the public to the availability of their chargemaster. But whether Eisenhower should be required to do more in this area is not an issue the UCL was designed to address; it is an issue better directed toward our Legislature.

## III

## DISPOSITION

We affirm the judgment. In the interests of justice, the parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH_____
                                                        Acting P.J.

We concur:

FIELDS_____
                    J.

MENETREZ_____
                    J.

17